## Levy Court of Baltimore County's Lessee vs. Gwynn.

June

Commissioners were appointed by the act of 1768, ch. 14, to lay out not more than one acre and an half of ground in Baltimore, and to agree with the owner thereof for the purchase, or if the owner would not or could not legally contract with them, they were authorized to issue their warrant to the sheriff for summoning

Appeal from *Baltimore* County Court. Ejectment for a lot of ground in the city of *Baltimore*, contained within the following metes and bounds, &c. The defendant, (now appellee,) took general defence, and the general issue was joined.

At the trial the plaintiff read in evidence the following agreement between the parties: "It is admitted, that the lot of ground described in the declaration is included a jury, not less than 12 freeholders, to appear before them at, &c. on, &c. to inquire to whom the land belonged, the value thereof, and what damages the owner would sustain by being deprived thereof The sum assessed to be paid by the commissioners, and the payment for the land, to invest the justices of *Baltimore* county, and their successors, with an estate in fee simple for the use of the county. The commissioners were to cause the land to be laid out with boundaries by the surveyor, and a certificate thereof to be entered on the county records. They were then to contract for building on the land a court-house and a prison, with a prison yard, and other conveniences The commissioners returned an inquisition, taken before them, also a plot and explanation thereof, by which it appeared, that one acre and a half and 67 square perches, were laid out. It did not appear that any attempt was made to agree with the owner of the land, nor that any warrant issued to summon a jury. The inquisition did not show that the jurors were freeholders. The jury did not find who was the owner of the whole land, and what damages would be sustained They found the owner and value as to part only. There were no boundaries fixed to the land surveyed, and it did not appear that the land condemned was the land surveyed. The survey was not made by the surveyor, but by a deputy. The proceedings were lodged in the office of the clerk of the county court, but not recorded. Evidence was given as to the signatures of the jurors, and that they were all freeholders; one of the commissioners, (the others being dead,) proved that they met under the act in order to execute it, and did, as he believed proceed regularly in the execution thereof, but he had no particular recollection of the acts done by them, further than his knowledge of his and their signatures, and of the signatures of some of the jurors A court-house and prison were erected on part of the ground, but not on that in dispute, The inquisition and plot, &c. were recorded in 1796, for safe keeping, by the clerk of the county court, it having remained in his office unrecorded until then. On an ejectment brought by the levy court to recover a part of the ground so condemned—*Held*, that the said proceedings were not evidence to prove that the premises, mentioned in the declaration, and described in such proceedings, were vested in the justices of *Baltimore* county for the time being, and their successors, in fee simple, for the use of the county, pursuant to the said act of assembly,

within the lines of the ground surveyed and laid out for the purpose of erecting thereon a court-house and prison for *Baltimore* county, under the direction of the commissioners appointed by act of assembly for that purpose. And also, that the ground so declared for is included within the lines and bounds of lots No. 1 and 2, parts of lot No. 11, in *Baltimore Town*, as laid off and sold by the commissioners appointed for the purpose of preserving confiscated *British* property, to *John M'Clure*; and that *Edward Fotteral*, formerly of *Baltimore Town*, was in his life-time seized in fee of lot No. 11, and died seized thereof. That the ground so declared for is part of said lot No. 11, of which part said *Fotteral* died seized, prior to the survey and condemnation of the same for the court-house and prison above mentioned." The plaintiff also read in evidence, by consent of the defendant, an act of the general assembly, passed at May session 1768, *ch.* 14, entitled, "An act for erecting a court-house and public prison for *Baltimore* county, in the Town of *Baltimore*, and for making sale of the old court-house and prison." By which act *John Beale Bordley*, &c. "or the major part of them, are empowered to apportion and lay out not more than one acre and half an acre of the upper part of *Calvert-street*, next *Jones's Falls*, and to agree with the owners thereof for the purchase, or if the owners will not or cannot legally contract with them, the said commissioners may issue their warrant to the sheriff of the county for summoning a jury of not less than twelve freeholders, to appear before them at *Baltimore Town*, upon a certain day, to inquire to whom the land belongs, the value thereof, and what damage the owner or owners will sustain by being deprived thereof. The sum assessed by the said jury is to be paid by the commissioners; and the payment for the land shall invest the justices of *Baltimore* county, and their successors, with an estate in fee simple, for the use of the county for ever. The commissioners are to cause the land to be laid out with boundaries by the surveyor, and a certificate thereof to be entered on the county records, they are then to contract for building on the said land a court-house and a prison, with a prison yard and other conveniences." The plaintiff also produced a paper, purporting to be an *inquisition*, taken before four of the commissioners named in the said act of assembly, being the major part of the commissioners, and a plat and certificate made out and returned by order of the said four commissioners, which paper was lodged by the said four commissioners in the clerk's office of *Baltimore* county court, more than forty years ago, and was admitted by the parties to have been signed and sealed by the said four commissioners, and by the persons whose names it bears as jurors, viz. "An inquisition indented and taken at *Baltimore Town*, in *Baltimore* county, before *John Moale, Robert Alexander, William Smith* and *Andrew Buchanan*, commission-

1816.

Levy Court
vs.
Gwynn

ers appointed by an act of assembly, entitled, An act for erecting a court house and public prison for *Baltimore* county, in the town of *Baltimore*, and for making sale of the old court house and prison, by the oaths of *John Smith*," &c. &c. "good and lawful men of the county aforesaid, jurymen duly summoned, sworn, and charged to say, upon their oaths, who is or are the owner or owners of the land laid off and included in the survey hereunto annexed, made by order of the said commissioners, agreeable to the said act, and what is the value of the said land, and what damages such owner or owners will sustain—Do upon their oaths say, that thirty square perches, part of the land included in the said survey, is part of a lot of land distinguished by the No. 11. in the plat of *Baltimore* town, and that the heirs of *Edward Fotterell* is owner thereof, and that the same is of the value of thirty-seven pounds fifteen shillings current money; and that one acre and one quarter of an acre and four perches and an half perch, other part of the land included in the said survey, is part of the lots No. 8," &c. "and that *A. L.* is owner thereof, and that the same is of the value of £82, and that 72 and an half perches, the remainder of the said land, is part of *Calvert* street, in *Baltimore* town, and that the said land will not sustain any damage. In testimony whereof, as well the said commissioners, as the said jurors, have hereunto set their hands and seals this 10th day of February, 1769 " Signed and sealed, &c. by the commissioners and jurors. "17th day of April 1770, Received of the commissioners, for building the court house and prison, the sum of thirty-seven pounds fifteen shillings current money, the sum mentioned in the within inquisition, as the value of the land therein specified to be the property of *Edward Fotterell's* heirs—received by virtue of a power of attorney from *Robert Tauff*, and *Achsah* his wife, the daughter and heir at law of the said *Edward Fotterell.*
      *John Flanagan.*"

The plat and certificate made by *James Everett*, deputy surveyor of *Baltimore* county, dated the 15th of December, 1768, also follow, containing one acre and seventy-four and a half square perches of land, 72½ square perches of which is part of *Calvert* street. The plaintiff also gave in evidence, that the persons whose names purport to be signed to the said paper as jurors to make the said inquisition, were inhabitants of the said county at the time when the inquisition purports to have been made, and then were among the most substantial freeholders thereof. He also gave in evidence, by *William Smith*, one of the said four commissioners, who was sworn as a witness in this cause, that the said four commissioners met under and by virtue of the said act of assembly, in order to execute the powers thereby vested in them, and did, as the said witness believed, proceed regularly in the execution thereof, according to the directions of the said act, but he had no particular recollection of the particular acts done by them further

than his knowledge of his and their signatures, and of some of the jurors. The plaintiff also gave in evidence, that the writing endorsed on the said paper, purporting to be a receipt by *John Flanagan* from the commissioners for building the court house and prison, for £37 15 0 current money, was signed by *Flanagan*, who declared himself to be, and was always reputed and acted as the agent for *Robert Taaffee*, before and during some time after the year 1770, and that before and during the year 1770, *Robert Taaffee*, and *Achsah* his wife, which *Achsah* was the only surviving child and heir at law of *Edward Fotterell* then deceased, resided in the kingdom of *Ireland*. He also gave in evidence, that on the 2d of March, 1796, the clerk of *Baltimore* county court did, of his own accord, enter and record the said paper and endorsements, for safe keeping and preservation, among the land records of *Baltimore* county; said paper having until that time, and ever since, remained in his office and keeping, where the said paper was, during the whole of that time, occasionally, and from time to time referred to by parties, whose property was affected thereby, to ascertain the limits of the public grounds. He also gave in evidence, that the commissioners named in the said act of assembly did, in pursuance thereof, immediately, or soon after the date of the said paper, proceed to erect, and did erect, on a part of the ground mentioned and described in the said paper as having been condemned in pursuance of the said act, a court-house and gaol for *Baltimore* county, which were for a long time used and occupied as such, and which court-house still continues to be so occupied, a new court-house for the said county having been since began, but not yet finished, on that part of the said ground, which was at first occupied by the said gaol; but neither the said court-house nor gaol, or any part of them, were upon the premises in the declaration in this case mentioned. He also gave in evidence, that *Daniel Chamier* was sheriff of *Baltimore* county during the year 1769; that he left this state about the year 1775, and never returned, and has been dead many years; that his official papers, which were in his possession, are lost. That all the commissioners and jurors before named, except *William Smith*, are dead. The plaintiff then offered to read to the jury the said paper, and the receipt thereon endorsed, as evidence to prove that the premises in the declaration mentioned, being part of the ground mentioned and described in and by the said paper, were vested in the justices of *Baltimore* county for the time being, and their successors, in fee simple, for the use of the said county, pursuant to the provisions of the said act of assembly. The defendant then moved the court to direct the jury, that the said paper, so offered as aforesaid, is not competent evidence for the purpose for which it was offered. Of which opinion the Court [*Nicholson*, Ch. J.] was, and directed the jury accordingly. The plaintiff excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued before CHASE, Ch. J. and BU-CHANAN, EARLE, JOHNSON, and MARTIN, J.

*Harper*, for the Appellant. Although the inquisition may not be strictly according to the act of assembly under which it was taken, yet it is substantially correct, and length of time, payment of the money under it, and the acquiescence of the parties, cures all defects, if any existed.

*W. Dorsey* and *Winder*, for the Appellee. Where a power or authority is specially delegated, it must be strictly pursued, and it must appear on the face of the proceedings that it was so pursued. They referred to *Kerr et al. vs. The State use of the Levy Court, &c.* 3 *Harr. & Johns.* 560. *Ellicott et al. vs. The Levy Court, &c.* 1 *Harr. & Johns.* 359. *Quynn vs. The State use Pue et al. Ibid* 36. By the act, under which the inquisition now under consideration was taken, a special authority was delegated— 1. The commissioners were to lay out one acre and an half, instead of which they laid out 307 square perches, or one acre and an half and 67 square perches, 2. It does not appear that any attempt to agree with the parties, who owned the land, was made by the commissioners. 3. Nor that any warrant issued to summon the jury. 4. The inquisition does not show that the jurors were *freeholders.* 5. The jury were directed by the act to find who were the owners of the land, and what damages would be sustained. They find the owner and value as to part, but say nothing as to the residue. They find, that the *heirs* of *E. Fotterell* were the owners, when they should have said who those heirs were. 6. The commissioners paid *Flanagan* when there was no evidence that he was the agent of *Fotterell's* heirs. 7. The commissioners were required to have the land surveyed and boundaries fixed. This was not done, nor does it appear that the land condemned was ever surveyed, or if surveyed, that it was the land which was condemned. If the survey which was made is legal, yet there are no boundaries stated in the certificate. There are blanks left, supposed to be intended to be filled up with a description of the boundaries. 8. The surveyor of *Baltimore* county was to make the survey, yet it was done by a deputy surveyor, who refers to an act different from the one which passed. 9. The proceedings were not recorded at the instance of the commissioners. They were lodged in the office, but by whom is not known. If all or any of these objections are held to be sufficient, the paper could not be read in evidence. They referred to *Rex vs. Sparling*, 1 *Stra.* 497. *Rex vs. Jarvis*, 1 *Burr.* 153; and *Rex vs. Croke*, 1 *Cowp.* 26, 27, 28, 29.

*Harper*, in reply. 1. The lines of the survey include more than an acre and an half, but 72 perches are part of *Calvert* street, and the act meant that the street should be excluded. 2. This objection cannot be taken advantage of

1816.

Levy Court
vs
Gwynn

by strangers. The immediate parties acquiesced at the time; they agreed to the proceedings, and received the valuation. It may be presumed, after a lapse of 40 years, that the parties were consulted. The daughter of *Fotterell* was a *feme covert*, living in *Ireland*, and she could not be consulted. 3. There must have been a warrant, as its effect was produced by the appearance of the jury, who would not have appeared without being summoned. 4. The evidence given at the trial was, that the jurors were freeholders, and the defect of the inquisition is supplied by the evidence It would be presumed that they were freeholders if there was no evidence that they were. 5. It was not certain at the time who were the heirs of *Fotterell*; and being named as heirs is quite sufficient. 6. If the proper person was not paid, the person entitled would have applied, and as no person has applied, the presumption is that *Flanagan* had authority to receive the money. 7. It is to be presumed that boundaries were fixed, and that the commissioners did their duty, and that they placed boundaries, which have since been removed, by cutting away the ground on which the court-house stood, which was upwards of 20 feet above where the street was cut as it now runs. The act does not say the surveyor was to fix boundaries, so that the blanks left in his certificate have nothing to do with the fixing of the boundaries by the commissioners. 8. The act of a sworn deputy is the act of his principal. He described the substance of the law, and did not refer to it by the title. 9. The proceedings were put into the proper office, and it must be presumed that they were placed there by the commissioners for the purpose of being recorded. Why placed there unless for that purpose? The clerk's omitting to record them is not to invalidate the copy produced. The proceedings being recorded by the present clerk shows that he considered it to have been the duty of his predecessor. There can be no doubt that special authorities in recent transactions must appear to have been strictly pursued. But from length of time, acquiescence, &c. a strict compliance will be presumed, and all defects cured. The defendant does not claim under any of the original owners or holders, and has therefore no right to call for a strict compliance with an authority of so long standing. This proceeding is to be considered as a conveyance, and the lessors of the plaintiff entitled to all that aid which every other conveyance is entitled to from presumption by length of time.

JUDGMENT AFFIRMED.